## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) KENDRA CROCKER and <br> (2) ALLEN MORA, as Co-Guardians of <br>   ERIC GRANT, <br>     Plaintiffs, <br> <br> vs. <br> <br> (1) VIC REGALADO, in his official capacity, <br> (2) STANLEY GLANZ, in his personal capacity, <br> (3) BOARD OF COUNTY COMMISSIONERS <br> of Tulsa County, and <br> (4) ARMOR CORRECTIONAL HEALTH <br> SERVICES, INC., <br> (5) JANE DOE NO. 1 <br> (6) JANE DOE NO. 2, <br>     Defendants. | Case No.: 17-cv-149-TCK-FHM <br> <br> ATTORNEY LIEN CLAIMED <br> JURY TRIAL DEMANDED |

## COMPLAINT

**COME NOW** the Plaintiffs, Kendra Crocker and Allen Mora as co-guardians of Eric Miguel Grant ("Plaintiffs") or ("Grant"), and for their Complaint against Defendants allege and state as follows:

## PARTIES

1. Kendra Crocker and Allen Mora, co-guardians of Eric Grant, are residents of Tulsa County, Oklahoma.

2. Defendant Stanley Glanz ("Sheriff Glanz" or "Glanz") was at all times relevant hereto, the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma, and acting under color of State law. Defendant Glanz, as Sheriff and the head of the Tulsa County Sheriff's Office ("TCSO"), was, at times relevant hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of TCSO, including the policies, practices, procedures, and/or customs that violated Mr. Grant's

1

rights as set forth in this Complaint. In addition, Sheriff Glanz was, until November 1, 2015, responsible for TCSO's law enforcement operations, including operation of the Tulsa County Jail. Defendant Glanz is sued in his individual capacity.

3. Defendant Vic Regalado ("Sheriff Regalado" or "Regalado") is the current Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of state law. Defendant Regalado is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.*, 566 F. App'x 731, 737 (10th Cir. 2014). Furthermore, Rule 25(d) of the Federal Rules of Civil Procedure provides that "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending", rather "[t]he officer's successor is automatically substituted as a party."

4. Defendant Board of County Commissioners of Tulsa County ("BOCC") is a statutorily-created governmental entity. 57 Okla Stat. § 41 provides that "[e]very county, by authority of the *board of county commissioners* and at the expense of the county, *shall have a jail* or access to a jail in another county *for the safekeeping of prisoners lawfully committed*." (emphasis added.)

5. Defendant Armor Correctional Health Services, Inc. ("ARMOR") is a foreign corporation doing business in Tulsa County, Oklahoma and was at all times relevant hereto responsible, in part, for providing medical and mental services and medication to Mr. Grant while he was in the custody of TCSO. ARMOR was additionally responsible, in part, for creating and implementing policies, practices, and protocols that govern the provision of medical and

mental health care to inmates at the Tula County Jail, and for training and supervising its employees. ARMOR was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such as ARMOR because an agency or instrumentality of the state and subject to its constitutional limitations.

6. Defendant Jane Doe No. 1 was a booking nurse employed by Tulsa County and working in the Tulsa County Sheriff's Office booking area. Upon information and belief, she is a resident of Tulsa County.

7. Defendant John Doe No. 2 was a detention officer employed by Tulsa County and working in the Tulsa County Sheriff's Office booking area. Upon information and belief, he is a resident of Tulsa County.

## JURISDICTION AND VENUE

8. The acts giving rise to this lawsuit occurred in Tulsa County, State of Oklahoma.

9. Prior to bringing this Complaint, Plaintiffs complied with the tort claim notice provisions of the Oklahoma Government Tort Claim Act ("GTCA"), 51 O.S. § 151, *et seq.* by notifying Defendants of their intent to file state law claims in connection with the events and injuries described herein. The GTCA process has been exhausted. This action is timely brought pursuant to 51 O.S. § 157.

10. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth and Fourteenth Amendments to the United States constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

11. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

12. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

13. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL ALLEGATIONS

14. On or about June 24, 2015, Tulsa County Sheriff Deputy Greg Brown arrested Eric Grant on a non-violent misdemeanor charge of trespassing.

15. When Mr. Grant was booked into the Tulsa County Jail he was suffering from obvious, known, and serious mental health disorders, including schizophrenia. Despite the fact that Mr. Grant was in an obviously vulnerable state, personnel at the jail failed to take any of the necessary precautions to protect Mr. Grant before putting him into a dangerous correctional setting.

16. Due to his serious and obvious mental health needs, Mr. Grant should have received an immediate evaluation from a mental health specialist, or, at the very least, an immediate referral for a mental health evaluation. Indeed, due to his serious and obvious mental health needs, Mr. Grant should not have been cleared for booking at the Jail at all. Nevertheless, Mr. Grant was cleared, by TCSO and ARMOR booking staff, to enter the Jail. In violation of TCSO policies and the Oklahoma Jail standards, Mr. Grant received no mental health evaluation or referral and was placed in general population.

17. Instead of taking precautions to safeguard Mr. Grant, Defendants put Mr. Grant into a general population cell with a registered sex offender, Anthony Eugene Williams.

18. Almost immediately, Mr. Grant began to be harassed and threatened by Anthony Williams. Mr. Grant informed the jail personnel about the threats, some of which were of a sexual nature. For at least a week prior to the rape and assault on Plaintiff Grant, he asked to be transferred to another cell. Allen Mora, Mr. Grant's co-guardian, also called the jail and informed the Tulsa County Sheriff's Office of the danger Mr. Grant was in and the need to move him to another cell.

19. Still, despite the known, obvious, and substantial risk to Mr. Grant, personnel at the Tulsa County Jail failed to change his cell assignment or take any reasonable precautions to prevent the attack Mr. Grant suffered.

20. Moreover, Mr. Grant began to show clear signs of mental health issues, and even began barking, but no medical staff at the jail asked him any of the appropriate mental health questions or attempted to get Mr. Grant the mental health care he required. The medical staff at the jail failed to give Mr. Grant any of his needed medication.

21. On or about July 7, 2015, Anthony Williams pulled Mr. Grant from his bunk and began to brutally assault him. During this assault, Mr. Grant was knocked unconscious and brutally raped.

22. After the assault and rape, Mr. Grant was transported to the hospital where a rape kit was administered.

23. Mr. Grant should never have been placed in a general population cell to begin with, but once placed there, medical and correctional staff should have been on high alert due to substantial risks to Mr. Grant's safety. As evidenced by the brutal assault and rape of Mr. Grant,

Defendants provided utterly inadequate care and utterly inadequate or non-existent supervision and protection, in deliberate indifference to his physical health, mental health, and safety.

24. Defendants' deliberate indifference to the known or obvious risks to Mr. Grant's physical health, mental health, safety and well-being was a direct and proximate cause of his injuries and extreme mental and emotional trauma.

25. This assault occurred while Mr. Grant was in the custody of the Tulsa County Jail and was a result of the negligence and/or deliberate indifference of the Tulsa County Sheriff's Office and the personnel at the Tulsa County Jail. This tragic and preventable attack caused Mr. Grant physical injuries, as well as extreme mental pain and suffering.

26. The deliberate indifference to Mr. Grant's mental health and safety, as summarized *supra*, was in furtherance of and consistent with: a) policies, customs, and/or practices which Sheriff Glanz promulgated, created, implemented or possessed responsibility for the continued operation of; and b) policies, customs, and/or practices which ARMOR Correctional Health Services developed and/or had responsibility for implementing.

27. There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail. Sheriff Glanz has long known of these systemic deficiencies and the substantial risks to inmates like Mr. Grant, but have failed to take reasonable steps to alleviate those deficiencies and risks.

28. For instance, in 2007, the National Commission on Correctional Health Care ("NCCHC"), a corrections health accreditation body, conducted an on-site audit of the Jail's health services program. At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to perform mental health screenings, failure to fully complete mental health treatment plans, failure to triage sick calls,

failure to conduct quality assurance studies, and failure to address health care needs in a timely manner. NCCHC made these findings of deficient care despite Sheriff Glanz's/TCSO's efforts to defraud the auditors by concealing information and falsifying medical records and charts.

29. Sheriff Glanz failed to change or improve any health care policies or practices in response to NCCHC's findings.

30. There is a long-standing failure to secure adequate mental health care, and to properly classify and protect inmates with obvious and serious mental health needs. For examples, in 2009, TCSO was cited by the Oklahoma State Department of Health for violation of the Oklahoma Jail Standards in connection with the suicide death of an inmate with schizophrenia.

31. NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

32. NCCHC once again found numerous serious deficiencies with the health services program. As part of the final 2010 Report, NCCHC found, inter alia, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year…. The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "…diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented…"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does

7

not issue follow-up orders as clinically needed"; and "… potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks. Training for custody staff has been limited. Follow up with the suicidal inmate has been poor." 2010 NCCHC Report (emphasis added).

33. Sheriff Glanz only read the first two or three pages of the 2010 NCCHC Report. Sheriff Glanz is unaware of any policies or practices changing at the Jail in response to 2010 NCCHC Report.

34. Over a period of many years, Tammy Harrington, R.N., former Director of Nursing ("DON") at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates. The deficiencies observed and documented by Director Harrington include: chronic failure to triage inmates' requests for medical and mental health assistance; a chronic lack of supervision of clinical staff; and repeated failures of medical staff to alleviate known and significant deficiencies in the health services program at the Jail.

35. On September 29, 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported its findings in connection with an audit of the Jail's medical system – pertaining to U.S. Immigration and Customs Enforcement ("ICE") detainees -- as follows: "CRCL found a prevailing attitude among clinic staff of indifference…."; "Nurses are undertrained. Not documenting or evaluating patients properly."; "Found one case clearly demonstrates a lack of training, perforated appendix due to lack of training and supervision"; "Found two … detainees with clear mental/medical problems that have not seen a doctor."; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to

utilize what we have learned in the past 20 years". "ICE-CRCL Report, 9/29/11 (emphasis added).

36. Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued.

37. To the contrary, less than 30 days later the ICE-CRCL Report was issued, on October 27, 2011 another inmate, Elliott Earl Williams, died at the Jail as a result of the truly inhumane treatment and reckless medial neglect which defies any standard of human decency.

38. In the wake of the Williams death, which was fully investigated by TCSO, Sheriff Glanz made no meaningful improvements to the medical system. This is evidenced by the fact that yet another inmate, Gregory Brown, died due to grossly deficient care just months after Mr. Williams.

39. On November 18, 2011 AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality." AMS-Roemer specifically commented on no less than six (6) inmate deaths, finding deficiencies in the care provided to each.

40. It is clear that Sheriff Glanz did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMSRoemer continued to find serious deficiencies in the delivery of care at the Jail. For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure to follow NCCHC guidelines "to get patients to providers," and "[n]ot enough training or supervision of nursing staff."

41. In November 2013, BOCC/TCSO/Sheriff Glanz retained ARMOR as the new private medical provider. However, this step has not alleviated the constitutional deficiencies with the medical system. Medical staff is still undertrained and inadequately supervised and inmates are still being denied timely and sufficient medical attention. Bad medical and mental health outcomes have persisted due to inadequate supervision and training of medical staff, and due to the contractual relationship between BOCC/TCSO/Sheriff Glanz and ARMOR (which provides financial disincentives the transfer of inmates in need of care from an outside facility). Sheriff Glanz and ARMOR have known of the deficiencies, and the substantial risks posed to inmates like Plaintiff, but have failed to take reasonable steps to alleviate the risks.

42. There is a well-established policy, practice and/or custom of understaffing the Jail, failing to adequately assess, treat and supervise inmates with serious mental health needs. There is a continuing policy or custom of overcrowding the Jail and failing to protect inmates with serious mental health needs.

43. As alleged herein, there are deep-seated and well-known policies, practices and/or customs of systemic, dangerous and unconstitutional failures to provide adequate medical and mental health care to inmates at the Tulsa County Jail. This system of deficient care -- which evinces fundamental failures to train and supervise medical and detention personnel -- created substantial, known and obvious risks to the health and safety of inmates like Mr. Grant. Still, Sheriff Glanz and ARMOR have failed to take reasonable steps to alleviate the substantial risks to inmate health and safety, in deliberate indifference to Mr. Grant's physical health, mental health, and safety, in deliberate indifference to Mr. Grant's serious medical needs.

## CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Cruel and Unusual Punishment in Violation of the Eighth
and Fourteenth Amendments to the Constitution of the United States
(42 U.S.C. § 1983)**

**A.     Allegations Applicable to All Defendants**

44.    Plaintiffs re-allege and incorporate by reference paragraphs 1 to 43, as though fully set forth herein.

45.    Defendants knew, or it was obvious, that there was a strong likelihood that Mr. Grant was in danger of serious injury and harm as set forth herein.

46.    Defendants failed to provide adequate mental health care and supervision to Mr. Grant while he was in the Tulsa County Jail.

47.    Defendants' acts and/or omission as alleged herein, including but not limited to their failure to provide Mr. Grant with adequate supervision, delayed response and/or failure to take other measures to protect him from physical harm, constitute deliberate indifference to Mr. Grant's health and safety and resulted in his injuries.

48.    As a direct and proximate result of Defendants' conduct, Mr. Grant experienced physical pain, severe emotional distress, mental anguish, and the damages alleged herein.

49.    The aforementioned acts and/or omissions of the individually named Defendants were malicious, reckless and/or accomplished with a conscious disregard of Mr. Grant's rights thereby entitling Plaintiffs to an award of exemplary and punitive damages according to proof.

**B.     Supervisor and Official Capacity Liability (Sheriff Glanz)**

50.    Plaintiffs re-allege and incorporate by reference paragraphs 1 through 49 as though fully set forth herein.

51. The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Mr. Grant's health and safety and violating Mr. Grant's civil rights were the direct and proximate result of customs, practices, and policies for which Sheriff Glanz promulgated, created, implemented and/or possessed responsibility.

52. Such policies, customs and/or practices are specifically set forth in paragraphs 23-43, supra.

53. Sheriff Glanz, through his continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, has been deliberately indifferent to inmates', including Mr. Grant's, health and safety.

54. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Grant suffered injuries and damages as alleged herein.

C. **Municipal Liability (ARMOR)**

55. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 54 as though fully set forth herein.

56. ARMOR is a "person" for purposes of 42 U.S.C. § 1983.

57. At all times pertinent hereto, ARMOR was acting under color of state law.

58. ARMOR was endowed by Tulsa County with powers or functions governmental in nature, such ARMOR became an instrumentality of the state and subject to its constitutional limitations.

59. ARMOR was charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and have shared responsibility to adequately train and supervise their employees.

60. There is an affirmative causal link between the aforementioned deliberate indifference to Mr. Grant's serious mental health needs, his safety, and the violations of his civil rights, and the above-described customs, policies, and/or practices carried out by ARMOR.

61. ARMOR knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Grant. Nevertheless, ARMOR failed to take reasonable steps to alleviate those risks in deliberate indifference to inmates', including Mr. Grant's serious mental health needs.

62. ARMOR tacitly encouraged, ratified, and/or approved of the unconstitutional acts and/or omissions alleged herein.

63. There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Mr. Grant's injuries and damages as alleged herein.

## SECOND CLAIM FOR RELIEF

### Negligence
(Defendant ARMOR)

64. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 63 as though fully set forth herein.

65. ARMOR owed a duty to Mr. Grant, and all other inmates in custody, to use reasonable care to provide inmates in need of medical attention with appropriate treatment.

66. ARMOR breached that duty by failing to provide Mr. Grant with prompt and adequate mental health treatment despite Mr. Grant's obvious needs.

67. ARMOR's breaches of the duty of care include, inter alia: failure to treat Mr. Grant's serious mental health condition properly; failure to conduct appropriate medical and

13

mental health assessments; failure to create and implement appropriate medical and mental health treatment plans; failure to promptly evaluate Mr. Grant's mental health; failure to properly monitor Mr. Grant's mental health; failure to provide access to mental health personnel capable of evaluating and treating his serious health needs; failure to place Mr. Grant in a medical cell or other area apart from general population; and a failure to take precautions to prevent Mr. Grant from injury.

68. As a direct and proximate cause of ARMOR's negligence, Mr. Grant experienced physical pain, severe emotional distress, mental anguish, and the damages alleged herein.

69. As a direct and proximate cause Defendants' negligence, Mr. Grant has suffered real and actual damages, including medical expenses, mental and physical pain and suffering, emotional distress, lost wages and other damages in excess of $75,000.00.

70. ARMOR is vicariously liable for the negligence of their employees and agents.

71. ARMOR is also directly liable for their own negligence.

**THIRD CLAIM FOR RELIEF**

**Violation of Article II § 9 of the Constitution of the State of Oklahoma
Cruel and Unusual Punishment and Deliberate Indifference**

72. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 71, as though fully set forth herein.

73. Article II § 9 of the Oklahoma Constitution prohibits the infliction of cruel and unusual punishment. Under the Oklahoma Constitution's Due Process Clause, Article II § 7, the right to be free from cruel and unusual punishment extends to pre-trial detainees, like Mr. Grant, who have yet to be convicted of a crime (in addition to convicted prisoners who are clearly protected under Article II § 9).

74. The protections afforded to pre-trial detainees under Oklahoma Constitution's Due Process Clause, Article II § 7, include the provision of adequate mental health care and protection from assault while in custody.

75. As set forth herein, Mr. Grant was denied adequate mental health care and denied sufficient supervision and protection and suffered a severe physical assault that left him permanently injured. Defendants violated the rights of Mr. Grant by failing to provide him with prompt and adequate supervision, failing to intervene to prevent further injury, overpopulating the jail, and understaffing the jail despite the obvious need.

76. At all times relevant, the jail personnel described in this Complaint were acting within the scope of their employment and under the direct control of Defendant Glanz, the Sheriff of Tulsa County and/or ARMOR.

77. Defendants' failure to supervise and provide adequate mental health care and protection to Mr. Grant was the direct and proximate cause of Mr. Grant injuries, physical pain, severe emotional distress, mental anguish, and all other damages alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiffs pray that this Court grant them the relief sought including, but not limited to, actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, and all other relief deemed appropriate by this Court.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Donald E. Smolen, II OBA #19944
Bob Blakemore, OBA #18656
Smolen, Smolen & Roytman, PLLC
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669
**Attorneys for Plaintiff**